PPG INDUSTRIES, INC., Plaintiff,

v.

UNITED STATES, Defendant,

Vitro Flex, S.A. and Cristales Inastillables De Mexico, S.A., Defendants–Intervenors.

Court No. 89–12–00678.

United States Court of International Trade.

Dec. 12, 1991.

Stewart and Stewart, Terence P. Stewart, David Scott Nance and Margaret E.O. Edozien, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Liti-

gation Branch, Civ. Div., U.S. Dept. of Justice, A. David Lafer and Jane E. Meehan, Craig R. Giesse and Diane M. McDevitt, of counsel, Atty. Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Brownstein, Zeidman and Schomer, Irwin P. Altschuler, David R. Amerine, Jeff P. Manciagli and Claudia G. Pasche, Washington, D.C., for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

CARMAN, Acting Chief Judge:

Plaintiff PPG Industries, Inc. ("PPG") moved pursuant to Rule 56.1 of the Rules of this Court for partial judgment upon the agency record. Defendant–Intervenors Vitro Flex, S.A. and Cristales Inastillables, S.A. filed a cross-claim against the United States pursuant to Rule 13(f), seeking judgment upon the agency record in support of their cross-claim. These challenges contest several aspects of the final determination of the International Trade Administration, United States Department of Commerce ("ITA" or "Commerce"), in *Fabricated Automotive Glass from Mexico; Final Results of Countervailing Duty Administrative Review*, 54 Fed.Reg. 51,908 (1989) (*"Final Results"*). ITA's review covers shipments of Mexican fabricated automotive glass for the period January 1, 1986, through December 31, 1986. ITA determined that the total bounty or grant for this period to be zero. *Final Results*, 54 Fed.Reg. at 51,912.

Plaintiff's motion challenges ITA's findings that (1) FICORCA[1] benefits were not provided to a specific enterprise or industry or group of enterprises or industries and, therefore, had not provided Mexican automotive glass producers with a countervailable benefit; (2) the Mexican natural gas program had not provided Mexican automotive glass producers with a countervailable benefit; (3) exports of automotive glass

---

1. FICORCA (Trust Fund for Coverage of Exchange Risks) is a trust fund established by the Mexican government and the Bank of Mexico to help companies refinance foreign debt. For a further explanation of FICORCA, see *PPG Indus., Inc. v. United States*, 11 CIT 344, 662 F.Supp. 258 (1987), aff'd, 9 Fed.Cir. (T) ——, 928 F.2d 1568 (1991).

had not benefitted from the payment of CEDIs;[2] and (4) the United States lacks authority to impose countervailing duties upon imports of automotive glass from Mexico entering the United States on or after August 24, 1986, the date of Mexico's accession to the General Agreement on Tariffs and Trade ("GATT"),[3] without an affirmative determination of injury to the domestic industry.

Defendant–Intervenors support Commerce's determination that Commerce lacks the authority to impose countervailing duties on the subject merchandise entering the United States after August 24, 1986. Defendant–Intervenors' cross-claim challenges Commerce's failure to terminate the continued suspension of liquidation of all post-GATT accession entries of the subject merchandise as contrary to United States countervailing duty law and the United States international obligations under the GATT. Defendant United States opposes both Plaintiff's motion and Defendant–Intervenors' cross-claim and seeks to sustain Commerce's determination in its entirety.

This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i) (1988) and 28 U.S.C. § 1581(c) (1988).

### Background

On July 31, 1984, PPG filed a petition with the ITA on behalf of the United States fabricated automotive glass industry, requesting the imposition of countervailing duties upon imports of fabricated automotive glass from Mexico. *Initiation of Countervailing Duty Investigation; Fabricated Automotive Glass from Mexico,* 49 Fed.Reg. 33,919 (1984) ("*Initiation of Countervailing Duty Investigation*"). The petition alleged, among other things, that the Mexican FICORCA and natural gas programs conferred bounties or grants upon the manufacture or production of fabricated automotive glass within the meaning of section 303 of the Tariff Act of 1930 ("Tariff Act"), *as amended,* 19 U.S.C. § 1303 (1982).

At the time of the initial countervailing duty determination, Mexico was not a "country under the Agreement" within the meaning of section 701(b) of the Tariff Act. *Initiation of Countervailing Duty Investigation,* 49 Fed.Reg. at 33,919; 19 U.S.C. §§ 1671 (1982). Accordingly, Commerce conducted the initial countervailing duty investigation pursuant to section 303 of the Tariff Act. *See* 19 U.S.C. § 1303. Furthermore, because Mexico was not a signatory to the GATT at that time, imports of the subject merchandise, a duty-free product pursuant to the United States Generalized System of Preferences, were not entitled to an injury determination during the initial investigation. *See* 19 U.S.C. § 1303(a)(2).

As a result of previous final countervailing duty determinations in which Commerce had determined that the Mexican FICORCA and natural gas programs did not confer countervailable domestic subsidies, Commerce declined to reinvestigate these two programs in the initial countervailing duty investigation of fabricated automotive glass from Mexico. *Initiation of Countervailing Duty Investigation,* 49 Fed.Reg. at 33,920.

On January 14, 1985, Commerce published a notice of its final affirmative countervailing duty determination and order. *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Fabricated Automotive Glass from Mexico,* 50 Fed.Reg. 1906 (1985). Commerce found that the Government of Mexico had provided bounties or grants within the meaning of section 303 of the Tariff Act to certain manufacturers or exporters of fabricated automotive glass. Pursuant to this countervailing duty order, Customs was directed to collect a cash deposit or bond on entries of the subject merchandise. *Id.* Commerce further stated that the suspension of liquidation ordered in the preliminary affirmative deter-

---

**2.** CEDIs (Certificado de Devolucion del Impuesto) are tax rebates for exports.

**3.** General Agreement on Tariffs and Trade, Oct. 30, 1947, 61 Stat. A3, T.I.A.S. No. 1700, 55 U.N.T.S. 184 (entered into force Jan. 1, 1948).

mination [4] was to remain in effect with the exception of automotive glass manufactured and exported by L–N Safety Glass.

On December 11, 1986, Commerce published the final results of its first countervailing duty administrative review of the order covering the subject merchandise. *Fabricated Automotive Glass from Mexico; Final Results of Countervailing Duty Administrative Review*, 51 Fed.Reg. 44,-652 (1986). This review covered the period October 24, 1984 through December 31, 1985. There, Commerce determined that the FICORCA, natural gas, and CEDI programs did not confer countervailable benefits upon Vitro Flex and Cristales, the respondents in that proceeding. PPG then challenged that determination before this Court. This Court sustained Commerce's determination with respect to the FICORCA, CEDI, and natural gas programs as supported by substantial evidence on the record and as otherwise in accordance with law. *PPG Indus., Inc. v. United States*, 14 CIT ——, 746 F.Supp. 119 (1990).

On January 28, 1987, Plaintiff and Defendant–Intervenors requested the ITA to conduct the second administrative review of the countervailing duty order covering calendar year 1986. Defendant–Intervenors additionally requested, in light of Mexico's accession to the GATT on August 24, 1986, the ITA to revoke the underlying countervailing duty order with respect to all entries of the subject merchandise made on or after that date. Administrative Record Document ("A.R. Doc.") 2.

On December 19, 1989, Commerce published its final results of the second countervailing duty administrative review, which is the subject of the instant action. *Final Results*, 54 Fed.Reg. 51,908. In the *Final Results*, Commerce determined that all Mexican government programs examined, including the FICORCA, natural gas, and CEDI programs, conferred "zero" countervailable benefits during the relevant review period. *Id.* at 51,909–12. Accordingly, Commerce instructed Customs

to liquidate all outstanding entries of the merchandise exported during the 1986 calendar year without regard to countervailing duties and directed that no countervailing duty deposits be collected henceforth. *Id.* Plaintiff then challenged the *Final Results* and, on January 5, 1990, obtained an injunction barring the liquidation of the entries covered by the review period. *See PPG Indus., Inc. v. United States*, 14 CIT ——, 729 F.Supp. 859 (1990). Defendant–Intervenors challenge certain portions of the *Final Results* relating to Mexico's accession to the GATT.

## Discussion

Commerce's determination must be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

Commerce's interpretations of the countervailing duty laws are accorded substantial deference and will be upheld as in accordance with law unless the interpretation is "unreasonable and plainly inconsistent with the statute, and ... unless weighty reasons require otherwise." *ICC Indus., Inc. v. United States*, 5 Fed.Cir. (T) 78, 84, 812 F.2d 694, 699 (1987) (citations omitted). Commerce's "interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable." 5 Fed.Cir. (T) at 85, 812 F.2d at 699 (emphasis in original).

This Court will now review Commerce's determinations with respect to the FICORCA, natural gas, and CEDI programs. Plaintiff's and Defendant–Intervenors' challenges to Commerce's findings concern-

**4.** *Preliminary Affirmative Countervailing Duty Determination; Fabricated Automotive Glass* *from Mexico,* 49 Fed.Reg. 43,984 (1984).

ing Mexico's accession to the GATT will be discussed subsequently.

### FICORCA

Plaintiff asserts several challenges to Commerce's determination that the FICORCA program is not countervailable. Each will be discussed in turn.

Plaintiff's first argument is that the Government of Mexico exercised discretion in providing FICORCA benefits to Vitro Flex and Cristales, which purportedly raised questions as to the countervailability of those benefits. Plaintiff lists these benefits as (1) the provisional enrollment of unrescheduled debt in FICORCA; (2) the enrollment of non-bank debt in FICORCA; and (3) the conversion of FICORCA debt into floating-rate notes. Next, Plaintiff argues that the FICORCA program conferred *de facto* countervailable benefits upon specific enterprises or industries by virtue of its restrictive eligibility requirements. Lastly, Plaintiff argues that Commerce's original determination concerning the non-countervailability of FICORCA was based upon a test inconsistent with the statute.

#### 1. *Provisional Enrollment in FICORCA*

 Plaintiff argues that the Mexican government exercised discretion in permitting certain companies to "provisionally" enroll "non-qualifying" (*i.e.*, other than long-term) debt in FICORCA, which Plaintiff contends had the effect of extending the deadline for those companies to enroll in FICORCA.

Plaintiff raised the same argument in the preliminary results of this administrative review. *See Fabricated Automotive Glass from Mexico; Preliminary Results of Countervailing Duty Administrative Review*, 54 Fed.Reg. 8782, 8783–84 (1989) ("*Preliminary Results*"). There, Commerce rejected PPG's argument, and made the following determination:

> When the period for registering debt into FICORCA closed, some companies had not yet concluded their FICORCA negotiations. The creditors issued a 'provisional' notice that the debt was in a

rescheduling process, which many firms referred to as provisional enrollment in FICORCA. The Vitro group reported long-term foreign debt 'provisionally' enrolled in FICORCA in notes to its 1984 financial statements. This merely meant that, until the creditors submitted a written statement to FICORCA advising that the debt had been rescheduled, FICORCA contracts would not be issued to the company or group. As stipulated in the FICORCA regulations, foreign debt had to be rescheduled prior to enrollment in the FICORCA program.

*Preliminary Results,* 54 Fed.Reg. at 8783–84.

In the *Final Results,* Commerce maintained its preliminary determination that there was no actual "provisional" enrollment of debt in FICORCA. *Final Results,* 54 Fed.Reg. at 51,910. Commerce concluded that the "alleged new features or changes to FICORCA programs were provided for in the original FICORCA regulations." *Id.* at 51,910.

Plaintiff challenges the adequacy of Commerce's verification concerning this issue. It argues that the verification was based solely upon an oral statement by a Mexican government official. According to Plaintiff, Commerce had an obligation to place documents in the record to corroborate this explanation or clarify the issue of provisional enrollment.

The verification report prepared by Commerce states that Commerce asked Mexican officials whether "debt could have been 'provisionally' enrolled in FICORCA by special government approval." A.R. Doc. 29 at 11. The report describes in some detail the explanation provided by Mexican government officials regarding provisional enrollment of debt, which was accepted by Commerce. Commerce determined that:

> One of the prerequisites for enrollment of debt in FICORCA was that the creditors had to submit a written statement to FICORCA giving notification that the foreign debt had been restructured. Foreign debt had to be restructured in accordance with the terms of the FICORCA contract (8–year terms with a 4–year

grace period). The creditor had to advise FICORCA that it had accepted the stipulations of the FICORCA contract on behalf of a third party (the firm). FICORCA I was terminated on November 5, 1983. At that time, many companies had not yet concluded their FICORCA negotiations. Creditor banks did not want to provide a written statement to FICORCA that the debt had been restructured, nor did they want to underwrite the contracts until the negotiations were completed. Instead, creditors issued a provisional notice stating that the debt was in a restructuring process. As such, many firms and creditors referred to this as provisional enrollment in FICORCA.

This terminology is incorrect. The contracts themselves were not temporary. The provisional notice merely meant that the rights of the FICORCA contract would be in favor of the firm until the creditors submitted a written statement to FICORCA stating that the debt had been restructured.

A.R. Doc. 29 at 11.

Congress has afforded Commerce a degree of latitude in implementing its verification procedures. *Kerr–McGee Chem. Corp. v. United States,* 14 CIT ——, ——, 739 F.Supp. 613, 628 (1990) (citing *Monsanto Co. v. United States,* 12 CIT 937, 947, 698 F.Supp. 275, 283 (1988)). Moreover, "[t]he decision to select a particular [verification] methodology rests solely within Commerce's sound discretion. As long as there is 'substantial evidence on the record' to support the choice, the Court will sustain the methodology chosen by Commerce." *Hercules, Inc. v. United States,* 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987). Further, when Commerce finds the information submitted by a respondent "to be complete and its explanations sound, it may need no further information." *Kerr–McGee,* 14 CIT at ——, 739 F.Supp. at 628.

This Court finds that Commerce's method of verification was reasonable and adequate under the circumstances. The explanation provided by the Mexican government regarding the FICORCA "provisional" enrollment controversy, as summarized

in the verification report, appears detailed and sensible. Simply because the information provided by the Mexican government was orally delivered does not, standing alone, make the information unreliable or less believable. Consequently, this Court concludes that it was reasonable for Commerce to rely upon the statements of the Mexican government that it did not exercise discretion in administering any "provisional" enrollment of FICORCA. Because there does not appear to be any evidence in the record indicating that the Mexican government permitted certain companies not otherwise eligible for the FICORCA program to enroll debt in that program, this Court finds Commerce's determination to be based on substantial evidence on the record, and otherwise in accordance with law.

2. *Enrollment of Non–Bank Debt in FICORCA*

▆▆▆▆ Plaintiff contends that there is information in the record that the Mexican government had exercised discretion in allowing the enrollment of non-bank debt in FICORCA. Therefore, asserts Plaintiff, Commerce should have reevaluated its original determination on the non-countervailability of FICORCA. Specifically, Plaintiff argues that the Mexican government gave special permission to the Vitro companies to enroll commercial paper in FICORCA. Plaintiff contends that because the Vitro companies had enrolled in such debt, Commerce should have investigated whether other automotive glass producers received countervailable benefits from non-bank debt enrollment.

In the *Final Results,* Commerce determined that

[i]t is clear from the [FICORCA] regulations that FICORCA was not intended solely for bank debt because Mexican firms having indebtedness denominated in a foreign currency and payable abroad to foreign financial entities, or suppliers, could participate in the FICORCA program. Thus, no special approval was required for non-bank debt.

*Final Results,* 54 Fed.Reg. at 51,910.

In support of its contention that special permission was required to enroll commer-

cial paper in FICORCA, PPG submitted the same information to Commerce that it had during the first administrative review. *See* A.R. Doc. 62 at 6–7 (second administrative review); A.R. Doc. 12 at 5 (first administrative review). Plaintiff's argument rests upon its own interpretation of the FICORCA provisions, which it asserts covers only loans from foreign *banks,* and not non-bank debt.

During verification Commerce reviewed the original FICORCA regulations and concluded that FICORCA had "always applied to all types of foreign debt," including non-bank debt. A.R. Doc. 29 at 12. This Court recognizes Commerce's expertise in interpreting the effect of foreign government programs under the countervailing duty laws. *See United States v. Zenith Radio Corp.,* 64 CCPA 130, 139, C.A.D. 1195, 562 F.2d 1209, 1216 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). Because Commerce is charged with the administration of the countervailing duty laws, it is afforded due deference in its reasonable interpretation of those laws. *ICC Indus.,* 5 Fed.Cir. (T) at 84, 812 F.2d at 699. Plaintiff has not put forth sufficient evidence that the Mexican government gave special permission to allow the enrollment of non-bank debt in FICORCA. Consequently, this Court holds that Commerce's determination in this regard is reasonable, based upon substantial evidence on the record and is otherwise in accordance with law.

3. *Conversion of FICORCA Debt into Floating–Rate Notes*

■ Plaintiff contends that the Mexican government exercised discretion in the bestowal of FICORCA benefits by granting permission to Mexican companies under certain circumstances to convert debt enrolled in FICORCA into floating-rate notes. The floating-rate notes were not subject to a normal 15% withholding tax on interest payments in Mexico. Plaintiff asserts that because special permission by the Mexican

government (through the National Registry of Securities, not FICORCA) was required to issue floating-rate notes, those FICORCA participants granted this permission could be viewed as receiving a specific (and countervailable) benefit from the Mexican government.

In the *Final Results,* Commerce stated that "[it] verified that the exporters of fabricated automotive glass did not convert FICORCA liabilities to floating rate notes." *Final Results,* 54 Fed.Reg. at 51,910. Plaintiff disputes this and contends that Commerce had information before it at verification that part of the debt Vitro Flex had enrolled in FICORCA consisted of floating-rate notes. A.R. Doc. 29 at 11. Defendant concedes that Commerce erred in stating that no exporters converted FICORCA liabilities to floating-rate notes, but nevertheless contends that according to the verification report, Vitro Flex received no actual benefit from the conversion.

The verification report indicates that Vitro Flex had converted FICORCA debt into floating-rate notes at the insistence of its foreign lenders—not to avoid paying the 15% withholding tax. *Id.* The report continues that from the borrower's point of view, "the only difference between the two types of notes [floating-rate and fixed-rate] is that under the floating-rate notes all of the interest is paid to the foreign bank but that under a fixed-rate note 85 percent of the interest is paid to the foreign bank and the remaining 15 percent is made to the Mexican government on behalf of the foreign bank." *Id.* Therefore, it appears that Vitro Flex received no actual, countervailable benefit from the Mexican government under these circumstances.[5] Consequently, this Court holds that Commerce's determination that the conversion of FICORCA debt into floating-rate notes did not result in the bestowal of countervailable benefits was reasonable, supported by substantial evidence on the record, and otherwise in accordance with law.

---

5. Commerce also stated that PPG provided no evidence to support its assumptions that (1) the interest on floating-rate notes is not taxed either in Mexico or in the bank's home jurisdiction and (2) that the withholding tax exemption on floating-rate notes is special to FICORCA contracts and not part of Mexico's general tax law. *Final Results,* 54 Fed.Reg. at 51,910.

### 4. FICORCA Eligibility Requirements

■ Plaintiff asserts that the FICORCA program conferred *de facto* countervailable benefits upon certain specific recipients because of the restrictive nature of FICORCA eligibility requirements. According to Plaintiff, Commerce failed to examine the actual distribution of FICORCA, which demonstrates that few Mexican companies actually received FICORCA benefits. PPG contends that record evidence of the small number of actual recipients of FICORCA should have prompted Commerce to reevaluate its previous determinations concerning the program's countervailability.

In response to Plaintiff's argument, Commerce stated that it had declined to reevaluate the FICORCA program in this regard because it had previously determined that benefits from FICORCA were neither countervailable nor targeted to a specific enterprise or industry, but rather were available to all Mexican firms with foreign indebtedness.[6] *Final Results,* 54 Fed.Reg. at 51,909. Commerce cited to its own prior determinations and two decisions of this Court, including *PPG Indus., Inc. v. United States,* 11 CIT at 344, 662 F.Supp. at 258 (*"PPG I "*), aff'd, 9 Fed.Cir (T) ——, 928 F.2d 1568 (1991), as support for its decision not to reevaluate the FICORCA program. In *PPG I,* this Court examined the issue of whether certain eligibility requirements of the FICORCA program had the actual effect of transforming that program into one which provides a countervail-able benefit to Mexican float glass producers. This Court found that FICORCA eligibility requirements did not create *de facto* countervailable benefits to a discrete class of beneficiaries. *PPG I,* 11 CIT at 353, 662 F.Supp. at 266.

Plaintiff insists that there was new information made available to Commerce showing that the Mexican government had exercised discretion in the bestowal of FICORCA benefits in the instant case. Specifically, Plaintiff contends that as a result of the FICORCA eligibility requirements, "only approximately 3.5% of all Mexican companies actually received FICORCA benefits. Of these *23* companies, or 0.0068% of all Mexican companies, accounted for over 63% of the debt covered by FICORCA." *Plaintiff's Memorandum in Support of Motion for Judgment on the Agency Record* at 9 (emphasis in original) (*"Plaintiff's Memorandum "*).

This "new" information submitted by Plaintiff with respect to the FICORCA eligibility requirements consists of portions of its own prehearing brief used in the 1984–1985 administrative review. *See* A.R. Doc. 12, Exh. 2, at 45–46; 51 Fed.Reg. 44,652 (1986). In the 1984–1985 administrative review, Commerce found that the FICORCA eligibility requirements did not result in *de facto* countervailable benefits. That determination was sustained by this Court in *PPG Indus., Inc. v. United States,* 14 CIT at ——, 746 F.Supp. at 119 (1990) (*"PPG III "*). In affirming Commerce's decision

---

**6.** Commerce determined:

We did not reevaluate our [previous] determinations regarding the FICORCA program during this administrative review. In 'Unprocessed Float Glass from Mexico; Final Affirmative Countervailing Duty Determination' (49 FR 23097; June 4, 1984), we determined that the FICORCA program was available to all Mexican firms with foreign indebtedness and that it was not targeted to a specific enterprise or industry, group of enterprises or industries, or to companies located in specific regions. In the 'Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Fabricated Automotive Glass from Mexico" (50 FR 1906; January 14, 1985), we stated that we did not initiate an investigation of the FICORCA program because we had previously found it not countervailable and because PPG had not provided new evidence sufficient to warrant reinvestigation. In 'Fabricated Automotive Glass from Mexico; Final Results of Countervailing Duty Administrative Review' (51 FR 44652; December 11, 1986) [first administrative review], *we examined new information provided by PPG regarding the availability and use of FICORCA* and reiterated our position that the FICORCA program is not provided to a specific enterprise or industry, or group of enterprises or industries, and that the program is not countervailable. Moreover, the Department's position on FICORCA has been upheld by the CIT in PPG 1 [*PPG Indus., Inc. v. United States,* 662 F.Supp. 258 (1987) ] and *PPG Industries, Inc. v. United States,* 712 F.Supp. 195 (1989) ('*PPG II* ').

*Final Results,* 54 Fed.Reg. at 51,909 (emphasis added).

not to reinvestigate FICORCA in *PPG III,* this Court observed that "Commerce has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination; in reaching its decision Commerce is entitled to draw upon its own knowledge and expertise and facts capable of judicial notice." *PPG III,* 14 CIT at ——, 746 F.Supp. at 135 (citations omitted). Commerce concluded that "the information submitted by PPG was not materially inconsistent with Commerce's analysis or conclusions in the float glass determination [*PPG I*], nor was the information otherwise of such import as to cast grave doubt on the soundness of Commerce's original determination that FICORCA was not countervailable." *Id.*

The substantial evidence standard of review applies to final determinations of Commerce. In this case, Commerce determined not to reinvestigate certain government programs. Therefore, the Court's role in the context of this case is to determine whether there was substantial evidence in the record to support Commerce's finding that no sufficient or material evidence was before it warranting reconsideration of the programs in issue. *See PPG III,* 14 CIT at ——, 746 F.Supp. at 135; *Can–Am Corp. v. United States,* 11 CIT 424, 429, 664 F.Supp. 1444, 1449 (1987). The evidence put forth by Plaintiff for the 1986 review period regarding FICORCA eligibility requirements is not materially inconsistent with Commerce's earlier determinations that those eligibility requirements do not render the FICORCA program countervailable. Consequently, this Court holds that Commerce's decision to not reinvestigate the FICORCA program with respect to the eligibility issue to be reasonable, based upon substantial evidence in the record, and otherwise in accordance with law.

### 5. *The Legal Standard Applied by Commerce*

■ Finally, PPG argues that prior affirmative countervailing duty determinations and decisions of this Court relied on by Commerce in the *Final Results* concerning the non-countervailability of FICORCA were based upon a definition of a domestic subsidy (*i.e.,* nominal general availability) that has since been rejected by this Court and by Congress. Therefore, argues Plaintiff, Commerce should have reconsidered those earlier determinations.

Plaintiff directs this Court to the "Special Rule" [7] pertaining to domestic subsidies that was added in the Omnibus Trade and Competitiveness Act of 1988 as support for its assertion that Congress intended Commerce to reject any "nominal general availability" test for determining whether a government subsidy is provided to a specific industry. Because this amendment, argues Plaintiff, was intended by Congress as a "clarification" of existing law, it should be considered by this Court even though the amendment technically applies only to administrative reviews commenced after August 23, 1988. *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 1337(b), 102 Stat. 1107, 1211 (1988).

Plaintiff's point of view regarding the proper legal standard that was applied in relevant prior determinations by Commerce and this Court is not material to this case for a number of reasons. First, the Special Rule governing subsidies by nature of its effective date is not technically applicable to the instant administrative review and need not be discussed by this Court. The only issue here is whether Commerce's determination not to reinvestigate FICORCA was reasonable, based upon substantial evi-

---

**7.** The "Special Rule" that is applicable to domestic subsidies under 19 U.S.C. § 1677(5)(B) (1988) provides:

In applying subparagraph (A) [the general definition of a subsidy], the administering authority, in each investigation, shall determine whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or indus-

tries. Nominal general availability, under the terms of the law, regulation, program, or rule establishing a bounty, grant, or subsidy, of the benefits thereunder is not a basis for determining that the bounty, grant, or subsidy is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof.

dence, and otherwise in accordance with law.

Further, one case relied on by Commerce to support its determination not to reinvestigate, *PPG I,* 11 CIT at 344, 662 F.Supp. at 258, has recently been upheld by the Federal Circuit. *PPG Indus., Inc. v. United States,* 9 Fed.Cir. (T) at ——, 928 F.2d at 1568. In *PPG I,* PPG argued unsuccessfully that Commerce improperly relied upon the general availability test which was rejected by this Court in *Cabot Corp. v. United States,* 9 CIT 489, 620 F.Supp. 722 (1985), *appeal dismissed,* 4 Fed.Cir. (T) 80, 788 F.2d 1539 (1986). *PPG I,* 11 CIT at 352–53, 662 F.Supp. at 265–66.

Plaintiff's persistent attack on Commerce's determinations not to reinvestigate certain government programs was recently encountered by this Court in *PPG III.* In *PPG III,* PPG challenged Commerce's determination not to reinvestigate the FICORCA program in the 1984–1985 administrative review, claiming, as it does here, that Commerce improperly employed the general availability test. It was noted earlier in this opinion that *PPG III* recognized Commerce's discretion in deciding whether to reinvestigate a government program. The information submitted by PPG was found by Commerce to be insufficient to justify reinvestigation. This Court found that it was reasonable under the circumstances of that case for Commerce not to reinvestigate FICORCA, and upheld the determination as based upon substantial evidence and in accordance with law. *PPG III,* 14 CIT at ——, 746 F.Supp. at 135.

The rationale of *PPG III* clearly applies to the instant case. Commerce had no new or materially different evidence before it in the 1986 review than it had in the 1984–1985 review with respect to FICORCA. As noted, Commerce's determination not to reinvestigate FICORCA in the 1984–1985 review was upheld as based upon substantial evidence. This Court can find no reason, in the absence of some compelling new information of record, to now require Commerce to engage in a useless exercise of reinvestigating that which has already been before Commerce and disposed of.

This Court concludes that Commerce reasonably declined to reinvestigate FICORCA in the context of this case. There is no persuasive evidence in the record that Mexican automotive glass producers had received countervailable benefits within the meaning of the law. After reviewing Plaintiff's evidence, which was essentially a reassertion of past, rejected evidence, Commerce acted within its discretion in not reinvestigating FICORCA. Where, however, plaintiff put forth "new" evidence of certain allegedly discretionary features of FICORCA, Commerce analyzed these features and verified that they were part of the original FICORCA regulations and not independent acts of government discretion.

Plaintiff also contends that two recent interpretations of domestic subsidy by this court in *Armco, Inc. v. United States,* 14 CIT ——, 733 F.Supp. 1514 (1990) and *Roses, Inc. v. United States,* 14 CIT ——, 743 F.Supp. 870 (1990), are in conflict with the standard used by Commerce in its final determination with respect to FICORCA. Defendant agrees with Plaintiff's view that these decisions conflict with the standard utilized by Commerce in the *Final Results,* but argues that those decisions were wrongly decided and should not be considered by this Court. The Court disagrees with both Plaintiff and Defendant that those cases somehow undermine Commerce's determination in the instant action.

The issue before the court in *Armco* was the countervailability of a depreciation allowance provision in the tax laws of Malaysia. This provision made available to Malaysian companies "annual depreciation allowances of varying percentages for various business expenditures." 14 CIT at ——, 733 F.Supp. at 1517. The court explained that "the annual allowances var[ied] in percentage according to the useful life, as determined by the Malaysian Government, of the particular asset on which the qualifying expenditure was made." *Id.* The plaintiffs in *Armco* argued that the annual depreciation allowances operated to give wire rod (the subject merchandise) producers in Malaysia a countervailable benefit because, *inter alia,* "the

annual depreciation rate for wire production facilities is not related to the useful life of these assets and is greater than the allowance for other steel manufacturing facilities and for most other industries in Malaysia." *Id.*, 733 F.Supp. at 1518.

The court in *Armco* noted that at the time of Commerce's investigation of the case, only one Malaysian company was producing the subject merchandise and only one Malaysian company (a wholly-owned subsidiary of the wire rod producer) exported the product to the United States. The Court reached the conclusion that a particular benefit could be a countervailable subsidy if that benefit is utilized by a small number of companies, and remanded the case to the agency. *Id.*, 733 F.Supp. at 1530, 1532. The court applied the case-by-case analysis set forth in *Cabot Corp. v. United States*, 12 CIT 664, 694 F.Supp. 949 (1988), namely, that a nominal generally available government program can, under certain circumstances, render *de facto* countervailable benefits on a specific enterprise or industry, or group thereof. *Armco*, 14 CIT at ——, 733 F.Supp. at 1529.

■ Commerce's determination in the instant case is consistent with the countervailing duty laws and the agency's discretion thereunder. Commerce was aware of the actual number of companies that were eligible for and received FICORCA benefits, but nevertheless concluded that no countervailable benefits were conferred on a specific industry. The cases relied upon by Commerce to support its decision not to reinvestigate applied the same case-by-case analysis that was described in *Armco*. *See, e.g., PPG I*, 11 CIT at 344, 662 F.Supp. at 258. Commerce has an obligation, where appropriate, to draw reasonable factual distinctions in its determinations with regard to the countervailable effect of a particular government program. Based upon a close examination of the record, this Court can discern no significant, countervailable competitive advantage bestowed upon the companies receiving FICORCA benefits.

Further, this Court disagrees that the test applied in the *Roses* case conflicts with the determination reached by Commerce in the *Final Results*. In *Roses*, the court examined the FIRA program, a loan program used by the Mexican government to provide loans at preferential rates to producers of several agricultural products. The court stated that the appropriate test for countervailability in the investigation under review was "whether a competitive advantage *in fact* was bestowed on a specific enterprise or industry, or a group thereof, by the program at issue." *Roses*, 14 CIT at ——, 743 F.Supp. at 879 (emphasis in original). To determine whether any actual countervailable benefit had been conferred, the court focused principally on the discretion exercised by the Mexican government in administering the FIRA program. In determining that such discretion might have been exercised, the *Roses* court applied the standard used in *PPG I* but distinguished that case on its facts. The court in *Roses* opined that although both FIRA and FICORCA programs were available only to a limited number of enterprises, in the latter case the Mexican government apparently had no discretion in bestowing FICORCA loans, whereas FIRA loans did appear to be discretionary. *Roses*, 14 CIT at ——, 743 F.Supp. at 879–80.[8]

The *Roses* decision focused upon the discretionary nature of the FIRA program to determine whether some countervailable benefit might have been conferred upon a

---

**8.** In *Roses*, the court pointed out in comparing *PPG I* with the facts before it that

"[t]he FICORCA program ... offered dollars at a fixed rate to all enterprises which had incurred foreign debt within a certain time period. The qualifying enterprises were probably wholly unrelated. Moreover, it appears that there was no discretion allowed to Mexican officials in providing benefits under the FICORCA program. Any Mexican enterprise with foreign debt during the relevant time period had the right to purchase dollars at a published price. *FIRA, on the other hand, seems discretionary by its nature.* The FIRA loan at issue here was made to allow Florex to purchase the assets of another flower company ostensibly to protect local jobs. *Such a loan program appears different in kind from programs that supply resources to enterprises on a clear nondiscretionary basis.*"

14 CIT at ——, 743 F.Supp. at 879–80 (emphasis supplied).

specific recipient or group thereof. In the *Final Results*, Commerce also examined the alleged changes to FICORCA to determine whether the Mexican government exercised discretion in administering the program.

Based upon the above review of the relevant case law and Commerce's determination as a whole, this Court rejects Plaintiff's argument that Commerce relied upon an improper statutory test in determining that no bounties or grants were conferred upon a specific enterprise or industry, or group thereof and upholds Commerce's determination as based upon substantial evidence on the record and as otherwise in accordance with law.

### Natural Gas Program

■ Plaintiff raises the same basic challenge to Commerce's finding of non-countervailability for the natural gas program as it did for the FICORCA program—that Commerce applied an incorrect "specificity" test for countervailability. Plaintiff argues now, as it did in the first administrative review that the Mexican government's policy of selling natural gas to domestic industries at artificially low prices could have conferred a countervailable benefit upon Mexican producers of automotive glass.

In regard to the natural gas program Commerce rested upon its prior determinations, finding that PPG provided no new evidence to warrant reconsideration of those prior determinations. *Final Results*, 54 Fed.Reg. at 51,911. Commerce determined that:

PPG has not provided any new evidence that natural gas provided at government-controlled prices to all industrial users confers a countervailable benefit. We have repeatedly held that the provision of natural gas on these terms does not confer countervailable benefits. *See, e.g.*, 'Final Negative Countervailing Duty Determination; Anhydrous and Aqua Ammonia from Mexico' (48 FR 28522; June 22, 1983), and 'Unprocessed Float Glass from Mexico; Final Results of Countervailing Duty Administrative Re-

view' (51 FR 44503; December 10, 1986). Moreover, the Department's position was upheld in PPG I, PPG II, *Can–Am [Corp.] v. United States* [11 CIT 424], 664 F.Supp. 1444 (1987) and *Cabot Corp. v. United States* (Judgment for the Department) Court No. 86–09–01109.

*Id.* at 51,911–12.

Plaintiff once again asks this Court to reexamine the determinations of Commerce that have been upheld by this Court. This Court finds that the discretion exercised by Commerce in not reinvestigating the natural gas program was reasonable. Plaintiff has not demonstrated that Commerce abused that discretion under the facts of this case. Consequently, this Court holds that Commerce's determination must be upheld as supported by substantial evidence on the record and as in accordance with law.

### The CEDI Program

■ Plaintiff advances three arguments in support of its contention that Commerce erroneously determined that neither Vitro Flex or Cristales had received CEDI benefits during the 1986 review period: (1) that a company in the same Vitro group as the respondents had received CEDI benefits; (2) that the Mexican government had distributed CEDI benefits to export consortia during that period; and (3) that Commerce did not conduct an adequate verification of the CEDI program as a general matter.

In the *Final Results*, Commerce verified the following information:

[Vitro Flex and Cristales] did not receive CEDIs directly on the exports of automotive glass to the United States. We also verified that no automotive glass was exported to the United States through export consortia during the period of review. With respect to PPG's concern of possible indirect benefits, CEDIs are earned on a shipment-specific basis and are not transferable; any benefits received from them can only be used by the exporting company.

*Final Results*, 54 Fed.Reg. at 51,911.

It is clear from Commerce's determination that neither Vitro Flex nor Cristales

directly received CEDIs during the administrative review period. Commerce's verification of this fact was based not only upon the verification conducted in Mexico City before Mexican government officials; it also examined the company records of Vitro Flex and Cristales, as well as their 1986 tax returns. *See* A.R. Doc. 29 at 15 (Cristales), 18–19 (Vitro Flex).

According to Commerce's rationale, even assuming that the Mexican government had conferred CEDI benefits upon export consortia, the evidence demonstrates that no Mexican exporters of automotive glass could have realized such benefits because no automotive glass was exported during this administrative review period.

Plaintiff argues, nevertheless, that Commerce had an obligation to determine whether companies other than the direct recipients of CEDIs received benefits from the program indirectly. Plaintiff contends that "the ITA did not ... adequately verify that no export consortia related to the export of automobile glass received benefits." *Plaintiff's Memorandum* at 37. This Court holds that such a determination was unnecessary because Commerce verified that CEDIs are earned on a shipment-specific basis and are non-transferable, thus limiting the benefits received from them to the exporting company. Plaintiff has offered no sound reason why this determination should be not sustained. Therefore, Commerce's determination that Vitro Flex and Cristales did not receive either direct or indirect benefits from CEDIs must be upheld as supported by substantial evidence on the record and as otherwise in accordance with law.

### Mexico's Accession to the GATT

■■■ Several issues are raised concerning the legal impact of Mexico's accession to the GATT on Commerce's final determination regarding the 1986 review period. The dispositive issue, however, is whether Commerce's statement that it lacks authority to impose countervailing duties on post-accession entries made on or after August 24, 1986, without an affirmative injury determination from the United States International Trade Commission ("ITC") was tantamount to a "final determination" subject to judicial review by this Court. In other words this Court must determine whether Commerce's stated opinion concerning the effect of Mexico's accession to the GATT is a ripe subject for judicial review under the facts of this case.

Commerce published its *Final Results* on December 19, 1989, and with respect to the GATT issue, made the following determination:

The merchandise covered by this review is afforded duty-free status under the Generalized System of Preferences. Section 303(a)(2) prohibits the imposition of countervailing duties on duty-free products absent an affirmative injury determination when the United States has an 'international obligation' to provide such a test. Mexico's accession to the GATT imposes such an international obligation on the United States with respect to duty-free merchandise entered into the United States after the date of Mexico's accession.

*Assessment of duties is not an issue at this time because the total bounty or grant for the period January 1, 1986 through December 31, 1986, is zero.* Moreover, we are currently pursuing means by which an injury determination could be made concerning imports of Mexican automotive glass entered on or after August 24, 1986, the date of Mexico's accession to the GATT.

*Final Results*, 54 Fed.Reg. at 51,912 (emphasis added).

Subsequent to the *Final Results*, on August 10, 1990, Commerce initiated a "changed circumstances" countervailing duty administrative review as a vehicle for pursuing an injury determination and announced its intent to revoke the underlying countervailing duty order in the instant case. *Fabricated Automotive Glass from Mexico; Initiation and Preliminary Results of Changed Circumstances Countervailing Duty Administrative Review and Intent to Revoke Countervailing Duty Order*, 55 Fed.Reg. 32,672 (1990). On April 8, 1991, the final results of that

changed circumstances review were published by Commerce. *Fabricated Automotive Glass From Mexico; Final Results of Changed Circumstances Countervailing Duty Administrative Review and Revocation of Countervailing Duty Order,* 56 Fed.Reg. 14,234 (1991).[9] That determination, which revoked the underlying countervailing duty order effective August 24, 1986, is now being challenged before this Court in another lawsuit.

Plaintiff urges that the GATT question is ripe for judicial review in this case, arguing that Commerce's zero subsidy determination "incorporated" its statements concerning GATT. As such, contends Plaintiff, those statements are reviewable as part of the whole determination. According to Plaintiff, the changed circumstances proceedings are evidence of the conclusive nature of Commerce's opinion concerning the GATT, and the failure of this Court to address the issue here will subject all parties involved to unnecessary litigation expenses in future proceedings.

According to Defendant, Plaintiff incorrectly assumes that Commerce did not impose countervailing duties upon imports entered on or after August 24, 1986 *because of* Mexico's accession to the GATT. Defendant argues that the *only* final determination reached by Commerce in this regard was that the total bounty or grant for the review period was zero; any other language in that determination regarding Mexico's GATT accession was not relied upon by Commerce to reach its zero bounty or grant determination. According to Defendant, because Commerce did not decide the effect of Mexico's accession to the GATT, that issue is not yet ripe for judicial review.

Defendant insists that whatever relevance Commerce's stated position on the GATT issue could have is dependent upon

how this Court rules with respect to Commerce's finding of zero countervailable subsidies:

> This [GATT] issue will become relevant only if (1) this Court finds that Commerce erred in determining that the respondents received no countervailable subsidies during 1986 and a remand to the agency is necessary; *and* (2) upon remand, Commerce finds that, in light of this Court's remand decision, margins exist for entries made after Mexico's accession to the GATT. In the event that (1) this Court sustains Commerce's determination that there were no countervailable subsidies bestowed upon exports of fabricated autoglass during 1986; or (2) upon remand, Commerce redetermines that, even in light of this Court's remand decision, no margins exist upon the subject merchandise, the issue of whether Commerce possessed the authority to assess countervailing duties after August, 1986 need not be decided.

*Defendant's Supplemental Submission Pursuant to this Court's Request at Oral Argument,* at 19–20.

Defendant–Intervenors concur with Commerce's statement that the United States lacks authority to impose countervailing duties on the subject merchandise entered after August 24, 1986 absent an injury determination by the ITC. Moreover, Defendant–Intervenors share Plaintiff's view that Commerce's statement amounted to a "final determination" that is subject to judicial review by this Court in the context of this administrative review. Defendant–Intervenors' argument is that Commerce should have given effect to its "determination" by discontinuing the suspension of liquidation of the subject merchandise entered on or after August 24, 1986, until and

---

**9.** In its final changed circumstances determination, Commerce revoked the countervailing duty order effective August 24, 1986, corresponding to Mexico's accession to the GATT. *Fabricated Automotive Glass from Mexico; Final Results of Changed Circumstances Countervailing Duty Administrative Review and Revocation of Countervailing Duty Order,* 56 Fed.Reg. 14,234 (1991). Commerce interpreted Article VI of the GATT

and 19 U.S.C. § 1303(a)(2) to require a finding of injury prior to the imposition or levying of countervailing duties on duty-free items when the international obligations of the United States require it. *Id.* at 14,234–35. Commerce further interpreted the law to require retroactive application of the injury test on existing countervailing duty orders.

unless a legally valid injury determination should issue.

After carefully reviewing the *Final Results* and the administrative record upon which that determination is based, this Court concludes that while Commerce has given some indication as to its opinion concerning the effect of Mexico's accession to the GATT, as of the time of the final determination in this case Commerce has made no final, reviewable determination as to that issue.

In the *Final Results,* Commerce refrained from determining the effect of Mexico's accession to the GATT upon the subject merchandise covered by the review period because it had found zero subsidy margins. Because this Court has affirmed Commerce's zero margin determination and because this Court finds that Commerce did not make a final determination as to the affect of Mexico's accession to the GATT, judicial review by this Court as to the GATT question at this time would be premature.

10. *See Fabricated Automotive Glass from Mexico; Final Results of Changed Circumstances Countervailing Duty Administrative Review and*

Because the countervailing duty order is still in effect pending its possible vacation in a subsequent administrative review,[10] the preliminary injunction which was issued on January 5, 1990 suspending the liquidation of the subject merchandise should remain in effect.

### Conclusion

Commerce's determination that zero countervailable benefits were bestowed upon producers of fabricated automotive glass from Mexico for the 1986 review period is sustained.

Plaintiff's motion for judgment upon the agency record is denied; Defendant–Intervenors' cross-claim is dismissed.

Action dismissed.

*Revocation of Countervailing Duty Order,* 56 Fed.Reg. 14,234 (Apr. 8, 1991).